IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE: | CASE NO. 22-01676 (ESL) |
| ESJ TOWERS INC. D/B/A MARE ST. CLAIR HOTEL | CHAPTER 11 |
| Debtor | |
| COMMITTEE OF UNSECURED CREDITORS FOR ESJ TOWERS, INC. | ADVERSARY NO. 24-00055 (ESL) |
| Plaintiff | |
| vs. | |
| GARDENIA HOTEL PARTNERS, LLC; VERDE, LLC | |
| Defendants | **FILED AND ENTERED 4/1/2025** |

## OPINION AND ORDER

This case is before the court upon the *Amended Motion to Dismiss under Fed. R. Civ. P. 12(b)(6)* (the "*Motion to Dismiss*", dkt. #25) filed by co-defendant Gardenia Hotel Partners, LLC ("Gardenia"), the *Response to Gardenia's Motion to Dismiss* (the "*Opposition*", dkt. #39) filed by the Committee of Unsecured Creditors for ESJ Towers, Inc.'s ("UCC"), and the *Reply in Further Support of Motion to Dismiss under Fed. R. Civ. P. 12(b)(6)* (the "*Reply*", dkt. #45) filed by Gardenia.

For the reasons discussed below, the *Motion to Dismiss* (dkt. #25) is DENIED.

### Jurisdiction

The court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H). Venue of this proceeding is proper under 28 U.S.C. §§ 1408 and 1409.

Factual and Procedural Background

I.   Events Prior to the Bankruptcy Case, Bankr. Case No. 22-01676

1.   ESJ Towers Inc. is a single building consisting of 450 condominium units (the "Debtor" or the "Resort"). See dkt. #1, p. 2, ¶¶ 4-5.

2.   For all periods at issue in this adversary proceeding, Around the World Holdings ("ATWH") was the indirect owner of 100% of the Debtor's equity. See id., p. 3, ¶ 7.

3.   For all periods at issue in this adversary proceeding, ATWH also directly or indirectly owned 100% of the equity of co-defendant Verde, LLC ("Verde"), a corporation which owned the property and hotel adjacent to the Resort commonly known as "Jade" or "Verde" (the "Jade Hotel" or "Property No. 40,376"). See id., p. 3, ¶ 9. See also *Certification of Property No. 40,376*, dkt. #35-1, pp. 3-4, inscription no. 8 (Purchase and Sale).

4.   For all periods at issue in this adversary proceeding, Keith St. Clair ("Mr. St. Clair") was President of the Debtor, ATWH, and Verde. See id., p. 3, ¶¶ 8, 10.

5.   On or around January 26, 2017, Banco Popular de Puerto Rico ("BPPR") extended a credit facility to Verde secured by a mortgage over the Jade Hotel owned by Verde. See *Certification of Property No. 40,376*, dkt. #35-1, pp. 3-4, inscription no. 8 (Purchase and Sale); pp. 4-5, inscription no. 9 (Mortgage Securing Promissory Note); pp. 5-7, inscription no. 10 (Mortgage Securing Promissory Note); p. 7, marginal note no. 8.1 (Declaration of Financing).

6.   Thereafter, on or around November 23, 2021, the credit facility extended by BPPR to Verde was assigned by BPPR (as assignor) to Verde Hotel Partners, LLC ("VHP") as assignee.[1] See *Certification of Property No. 40,376*, dkt. #35-1, pp. 9-10, marginal note 8.2 (Declaration of Financing).[2]

---

[1] While the exact nature of the relationship between Verde (Register No. 363496) and VHP (Register No. 474510) is not clear from the record, nominative confusion notwithstanding, the companies appear to be separate entities. The court takes judicial notice pursuant to Fed. R. Evid. 201 of the information available on the Registry of Corporations of the of the Department of State of Puerto Rico.

[2] The remarks and/or conditions of marginal note 8.2 state: "This is an assignment of the Declaration of Financing from entry 8."

7. On December 17, 2021, VHP filed a collection of money and foreclosure of mortgage complaint against Verde; Conexus ESJ, LLC; ATWH; and Mr. St. Clair in the Puerto Rico Court of First Instance, Carolina Superior Part (the "PR Court of First Instance"), in the case stylized Verde Hotel Partners, LLC v. Verde LLC, *et al.*, Civil Case No. CA2021-CV-03496, in the principal amount of $22,111,257.50, plus interest and other sums. See *Deed of First Auction and Adjudication*, dkt. #26-2, p. 3, ¶ c. See also *Certification of Property No. 40,376*, dkt. #35-1, pp. 10-12, inscription A (Annotation of Complaint).

8. On January 18, 2022, notified on January 19, 2022, the PR Court of First Instance issued a *Judgment by Consent* in favor of VHP "in accordance with the terms of a *Sworn Consent to the Entry of Judgment Pursuant to Rule 35.4 of Civil Procedure* ('*Sworn Consent*')" wherein "Verde [] acknowledged that it breached its contractual obligations in accordance with the *Credit Agreement* of January 26, 2017 … and requested the entry of judgment against it []. In pertinent part, by the *Sworn Consent*[,] [Verde] along with [Mr. St. Clair], Conexus ESJ, LLC and [ATWH] ([] jointly 'the Guarantors') acknowledged that they jointly and severally owe VHP a sum of no less than [$22,111,257.50] of principal and the interest generated in accordance with the agreed terms." *Order for Confirmation of Adjudication or Judicial Sale*, dkt. #26-3, p. 1.

9. On January 20, 2022, VHP filed a *Motion for Execution of Judgment and to Authorize Sale in Public Auction* with the PR Court of First Instance. See id.

10. On January 20, 2022, notified January 24, 2022, the PR Court of First Instance issued an *Order for Execution* and a corresponding *Writ for Execution*. See id., pp. 1-2.

11. On February 25, 2022, a *Notice of Complaint* was recorded in the Karibe volume of Carolina North, Property No. 40,376, Annotation A. See *Deed of First Auction and Adjudication*, dkt. #26-2, p. 3, ¶ c. Also see *Certification of Property No. 40,376*, dkt. #35-1, pp. 10-12, inscription A (Annotation of Complaint).

12. On February 28, 2022, and March 1, 2022, respectively, the PR Court of First Instance issued an *Order for Execution Nun Pro Tunc* and a corresponding *Writ for Execution Nun Pro Tunc* "to fix a typographic and numerical error to proceed with the foreclosure of

-3-

Property 40,376 ('Property') recorded in page 150 of volume 941 of Carolina, First Section of Carolina." *Order for Confirmation of Adjudication or Judicial Sale*, dkt. #26-3, p. 2 (boldface omitted).

13. On March 28, 2022, VHP filed a *Motion to the Case File* by which it certified compliance with all the requirements provided in Rule 51.7 of Civil Procedure, 32 L.P.R.A. Ap. V, R. 51.7, to carry out the judicial sales. See id., p. 2.

14. In accordance with the *Judgment by Consent*, the Jade Hotel was sold at public auction. See id., p. 2.

15. The First Auction was held on March 29, 2022, and VHP bid for the minimum bid of $21,000,000.00, pursuant to which the Jade Hotel "was adjudicated in its favor to pay, to the extent possible, the amount owed, as recognized in the *Judgment by Consent*." *Order for Confirmation of Adjudication or Judicial Sale*, dkt. #26-3, p. 3.

16. No other third parties appeared to bid on the Jade Hotel at the First Auction. See *Deed of First Auction and Adjudication*, dkt. #26-2, p. 3.

17. On that same date, March 29, 2022, a Marshal of the PR Court of First Instance, Mr. Samuel González Isaac, executed a *Deed of First Auction and Adjudication* of the Jade Hotel in favor of VHP. See *Order for Confirmation of Adjudication or Judicial Sale*, dkt. #26-3, p. 3. See also *Deed of First Auction and Adjudication*, dkt. #26-2; *Certification of Property No. 40,376*, dkt. #35-1, pp. 12-15, inscription no. 13 (Judicial Sale (Foreclosure of Mortgage), Cancelation by Registration).[3]

18. Also on March 29, 2022, VHP filed with the PR Court of First Instance "a request for order of confirmation of judicial sale … by which it requested the confirmation of the validity of the procedures, the adjudication and sale of the Properties in partial payment of the *Judgment by Consent*". *Order for Confirmation of Adjudication or Judicial Sale*, dkt. #26-3, pp. 3-4.

---

[3] The *Deed of First Auction and Adjudication* was presented for inscription in the Digital Real Property Registry of the Commonwealth of Puerto Rico on April 4, 2022, and was recorded on May 16, 2022. See *Certification of Property No. 40,376*, dkt. #35-1, p. 15, inscription no. 13.

19. On April 1, 2022, the PR Court of First Instance issued an *Order for Confirmation of Adjudication or Judicial Sale* (dkt. #26-3) whereby it "confirm[ed] the mortgage foreclosure process in this case and … the sale of the [Jade Hotel] in favor of VHP, as all the formalities required in the legal proceedings have been met." Id., p. 4.

20. On or about May 11, 2022, VHP changed its name to "Gardenia Hotel Partners LLC". See *Certification of Property No. 40,376*, dkt. #35-1, pp. 16-17, inscription no. 14 (Change of Name). "By virtue of the name change, [Gardenia] is the continuation of the legal personality of [VHP]." Id.

21. On June 10, 2022, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code (the "Petition Date"). See Bankr. Case No. 22-01676, dkt. #1.

22. The UCC has standing to pursue certain claims, rights and causes of action, including claims under Chapter 5 of the Bankruptcy Code, pursuant to a *Stipulation on Standing of Official Committee of Unsecured Creditors to Pursue Avoidance Claims and Related Bankruptcy and State Law Claims on Behalf of Estate in Conjunction with the Debtor* (the "*Stipulation*", Bankr. Case No. 22-01676, dkt. #528, 1734) filed by the Debtor and the UCC, and granted by the court. See Bankr. Case No. 22-01676, dkt. #581, 1774.

II. The Adversary Proceeding, Adv. Proc. No. 24-00055

23. On June 10, 2024, the UCC filed the instant adversary proceeding *Complaint* (dkt. #1) against Gardenia (previously VHP) and Verde, asserting three (3) causes of action. The UCC alleges the Debtor made certain pre-petition transfers to Verde during the period of June 10, 2018, through the Petition Date, which they seek to avoid and recover under 11 U.S.C. §§ 544(b), 548, and 550(a)(2). The transfers are as follows:

 a. **The Jade Expenditures**. The UCC alleges that "in late 2017", the Debtor received a $4.8 million advance payment under an insurance policy issued by Chubb Insurance Company of Puerto Rico ("Chubb"), under which the Debtor and the ESJ Towers Condominium Homeowners Association, also known as the ESJ Towers Condominium Council of Co-Owners ("ESJ HOA"), were co-insureds. See dkt. #1, ¶¶ 11-

13. This payment was made for Hurricane Maria damages to the Resort. The UCC also alleges that "thereafter", Attenure Holdings Trust I and HRH Property Holdings, LLC (collectively, "Attenure"), advanced $1.5 million to the Debtor under an agreement pursuant to which Attenure would pursue recovery of the amounts still due under the Chubb insurance policy for a contingency fee. See id., ¶ 16. The UCC alleges that Chubb issued checks solely to the Debtor (Manager of the ESJ HOA), and that a "substantial portion" of the insurance and the Attenure advance were "expended" on the Jade Hotel (the "**First Jade Expenditure**" and "**Second Jade Expenditure**", respectively). See id., ¶¶ 14, 15, 17. The UCC alleges that "[o]n or about May 4, 2018," Parliament High Yield Fund LLC ("Parliament") lent $5 million to ATWH under a Term Loan Agreement (the "Parliament Loan") which ATWH "expended" on the Jade Hotel (the "**Third Jade Expenditure**") and/or on "investments and ventures other than the Debtor and its business". Id., ¶¶ 21, 23. The UCC alleges that Debtor pledged a substantial portion of their assets to secure the Parliament Loan and eventually guarantied the same. See id., ¶¶ 24, 29. The UCC alleges that "[o]n or about December 2, 2020," Oriental Bank extended $5.7 million to the Debtor in exchange for a Limited Subordinated Payment Guaranty Agreement pursuant to which the Debtor guarantied the Parliament Loan ("2020 Oriental Loan"). See id., ¶ 29. "During the period of June 10, 2022, through the Petition Date [(also June 10, 2022)]", the Debtor "expended millions" of the 2020 Oriental Loan on the Jade Hotel ("**Fourth Jade Expenditure**", collectively the "**Jade Expenditures**"). See id., ¶ 30. The UCC alleges that Verde paid no consideration to the Debtor for the Jade Expenditures. See id., ¶ 31.

b. **The Jade Timeshare Expenditures**. The UCC alleges that from "2018 through the end of 2021", the Debtor engaged in a scheme pursuant to which the Debtor induced over six hundred (600) vacation interval owners and vacation club members to "pay tens of thousands of dollars" or "more than $8 million" "for the right to pay a nominal administrative fee for a timeshare interest in [the Jade Hotel] once [it] obtained its

certificate of occupancy". A "substantial portion" of these payments were "invested … on the construction of the Jade [Hotel]" ("**Jade Timeshare Expenditures**"). See id., ¶¶ 32-35. The UCC alleges that Verde paid no consideration to the Debtor for the Jade Timeshare Expenditures. See id., ¶ 36.

c. **The Jade Foreclosure or Gardenia's Acquisition of the Jade Hotel**. The UCC alleges that "[i]n late 2021 or early 2022," Gardenia (previously VHP) purchased the credit facility extended by BPPR to Verde following Verde's default on the loan and entered into an agreement with Mr. St. Clair whereby Verde agreed to pay Mr. St. Clair "tens of thousands of dollars a month to consent to, and to cause Verde to consent to, a foreclosure of [the Jade Hotel]." Id., ¶¶ 38-39, 42. The UCC alleges that on January 18, 2022, Verde and Mr. St. Clair executed a consent foreclosure judgment pursuant to which Gardenia would foreclose on the Jade Hotel; that the foreclosure occurred by August 2022; and that when the Debtor's vacation interval owners and vacation club members contacted Gardenia to exercise their timeshare interests in the Jade Hotel, Gardenia alleged it had purchased the property free and clear of their interests (the "**Jade Foreclosure**"). See id., ¶¶ 44-47.

24. The court issued *Summons* on June 11, 2024 (dkt. #4 and 5), and allegedly served (i) Verde (c/o Brian Tester, Esq.) via USPS Priority Mail to "252 Ave. Ponce de Leon, Ste 200, San Juan, PR 00918-2022" on June 24, 2024 (dkt. #9, pp. 3-4), and (ii) Gardenia (c/o Jacobo Ortiz, Esq.) via USPS Priority Mail to "Metro Offier(sic) Park, 8 ST 1, STE 300, Guaynabo, PR 00968" on June 24, 2024 (dkt. #10, pp. 3-4).

25. Verde has not filed a response to the *Complaint* or otherwise appeared.

Position of the Parties

26. By Count I, the UCC seeks to avoid and recover (i) the Jade Expenditures and (ii) the Jade Timeshare Expenditures allegedly made "[d]uring the period of June 2020, through the Petition Date [(June 10, 2022)]", when the Debtor was "insolvent", and for which the Debtor "received less than reasonably equivalent value for" pursuant to Sections 548 and 550(a)(1). Id.,

¶¶ 63-68. The Jade Timeshare Expenditures were allegedly made "with the intent of hindering [,] delaying and defrauding" the vacation interval owners and vacation club members. Id., ¶ 67. By Count II, the UCC seeks to the UCC seeks to avoid and recover (i) the Jade Expenditures and (ii) the Jade Timeshare Expenditures allegedly made "[d]uring the period [of] June 10, 2018, through the Petition Date [(June 10, 2022)]" when the Debtor was "insolvent", and for which the Debtor "received no valuable consideration for" pursuant to Sections 544 and 550(a)(1), and Article 1246 of the old Puerto Rico Civil Code, 31 L.P.R.A. § 3495 (1930).[4] Id., ¶¶ 70-73. The Jade Timeshare Expenditures were allegedly made "with the intent of hindering or delaying and defrauding" the vacation interval owners and vacation club members. Id., ¶ 74. By Count III, the UCC seeks to recover the value of (i) the Jade Expenditures and (ii) the Jade Timeshare Expenditures pursuant to Section 550(a)(2). The UCC alleges that when the Jade Foreclosure began, Gardenia "knew" Verde had used "tens of millions" fraudulently transferred to Verde from the Debtor to construct the Jade Hotel. Id., ¶ 79. Thus, "Gardenia was not a good faith transferee of the fraudulently transferred property and funds." Id., ¶ 80. Count I and Count II seek relief solely against Verde; Count III seeks relief against both Verde and Gardenia. See id., p. 13 (conclusion).

27. On September 5, 2024, Gardenia filed the *Motion to Dismiss* under Fed. R. Civ. P. 12(b)(6) (dkt. #25). First, Gardenia argues that the transfers fall outside of the two-year and four-year lookback period allowed under 11 U.S.C §§ 548 and 544(b), respectively. They argue that, under 11 U.S.C § 548, a transfer occurs when a security interest is perfected. Gardenia avers that its own security interest over the Jade Hotel was perfected when BPPR perfected its security interest over the Jade Hotel, that is, when it presented the Deed of Mortgage No. 5 in the Puerto Rico Property Registry (the "Registry") in February 2017. See dkt. # 35-1, p. 5, inscription no. 9

---

[4] The old Puerto Rico Civil Code, 31 L.P.R.A. §§ 1 – 5305 (1930), was abrogated and superseded by the new Puerto Rico Civil Code, 31 L.P.R.A §§ 5311 – 11722 (2020), which became effective one hundred and eighty (180) days after its enactment; that is on November 28, 2020. Both versions of the Puerto Rico Civil Code provide that there is no retroactive effect unless expressly decreed. Compare 31 L.P.R.A § 5323 (2020) with 31 L.P.R.A. § 3 (1930) ("Laws shall not have a retroactive effect unless they expressly so decree") (Official Translation). Although the UCC did not specify which version of the Puerto Rico Civil Code is applicable, 31 L.P.R.A. § 3495 is attributable only to the old Puerto Rico Civil Code (1930). In considering the allegations in the *Complaint*, this court has not conceded that the statutes cited by the UCC are appropriate or govern the allegations outlined therein.

(Mortgage Securing Promissory Note). Second, Gardenia argues that foreclosure does not, as a matter of law, give rise to an action for fraudulent conveyance or recission under Puerto Rico law, citing González v. Quintana, 145 D.P.R. 463 (1998). See *Certified Translation of González v. Quintana*, dkt. #25-1. As such, the *Complaint* does not state a claim upon which relief may be granted. See dkt. # 25, p. 3. Third, Gardenia argues that it never had dominion or legal title over the funds the UCC seeks to avoid, and that the *Complaint* does not plead that Gardenia was the transferee and instead pleads that *the Debtor* transferred the funds *to Verde*, and *Verde invested the funds in the Jade Hotel*. Thus "the [C]omplaint fails to plausibly plead Gardenia was a transferee, which is an indispensable element of the asserted avoidance actions." Id. Fourth, Gardenia argues that the *Complaint* fails to comply with fraud pleading standards under Fed. R. Civ. P. 9(b), that is, stating with particularity the circumstances constituting fraud. See id., pp. 3-4. Fifth, Gardenia argues that where a mortgage foreclosure sale is conducted in accordance with all of the requirements of state law, as was the case with the Jade Foreclosure, the price received is presumed to be the "reasonably equivalent value" of the property sold, citing the *Order for Confirmation of Adjudication or Judicial Sale* issued by the PR Court of First Instance, and BFP v. Resolution Trust Corporation, 511 U.S. 531 (1994). See id., p. 4; *Order for Confirmation of Adjudication or Judicial Sale*, dkt. #26-3.

28.    On that same date, September 5, 2024, Gardenia filed an *Amended Motion for Judicial Notice* (dkt. #26) requesting the court take judicial notice under Fed. R. Evid. 201(c)(2) of a Certified Translation of the *Certification of Property No. 40,376* issued by the Digital Real Property Registry of the Commonwealth of Puerto Rico (the "Digital Registry") (dkt. #35-1); the *Deed of First Auction and Adjudication* executed by a Marshal of the PR Court of First Instance, Mr. Samuel González Isaac (dkt. #26-2); and the *Order for Confirmation of Adjudication or Judicial Sale* issued by the PR Court of First Instance (dkt. #26-3).[5]

---

[5] The extent to which a court may consider extrinsic evidence outside the four corners of the complaint depends upon whether that record, or the facts within it, are susceptible to judicial notice under Fed. R. Evid. 201. See Freeman v. Town of Hudson, 714 F.3d 29, 36 (1st Cir. 2013) (citations omitted) ("Under certain 'narrow exceptions,' some extrinsic documents may be considered without converting a motion to dismiss into a motion for summary judgment.

29. On October 12, 2024, the UCC filed the *Opposition* (dkt. #39) averring that the *Complaint* alleges both actual and constructive fraud, and that Fed. R. Civ. P. 9(b) is inapplicable to constructive fraud, citing In re Telexfree, LLC, 2023 WL 2168044 (Bankr. D. Mass. 2023). See dkt. #39, p. 7. The UCC argues that Count III adequately alleges that Gardenia is liable as a "successor transferee of Debtor's fraudulent transfers to Verde." Id., p. 8. The UCC also argues that Gardenia's averments as to the lookback period, foreclosure not giving rise to an action for fraudulent conveyance or recission, and the applicable pleading standard are irrelevant because the UCC does not seek to avoid the transfer of the mortgage lien over the Jade Hotel or the subsequent foreclosure of such lien. Id., p. 10. Instead, the UCC argues Count II states a viable claim against Gardenia as a "subsequent transferee" for its receipt of millions of dollars that the Debtor fraudulently transferred to Verde. See id., p. 10. Lastly, the UCC argues that, under Section 550(a)(2), a "subsequent transferee" is liable for either property fraudulently transferred or the value of such property "once a transfer is avoided". Citing In re Giant Gray, Inc., 629 B.R. 814, 845 (Bankr. S.D. Tex. 2020), the UCC argues that the language of Section 550(a)(2) — which states that "to the extent that a transfer is avoided … the trustee may recover … the property transferred, or … the value of such property, from … (2) any immediate or mediate transferee of such initial transferee"— supports that recovery may be sought from "successor transferees," namely, Gardenia. Dkt. #39, p. 11.

30. On November 25, 2024, Gardenia filed the *Reply* (dkt. #45) averring that it is not a transferee, initial or subsequent, because it never received the funds directly or had dominion over them. Dkt. #45, p. 4. Gardenia re-argues that the foreclosure of a mortgage perfected in 2017 is beyond the lookback period and any amount Verde allegedly invested in the Jade Hotel in 2022 does not change the year the lien was perfected, and that transfers are deemed to occur when a security interest is perfected. Gardenia also argues that it cannot be a subsequent transferee of a

---

These exceptions include 'documents the authenticity of which are not disputed by the parties; ... official public records; ... documents central to plaintiffs' claim; [and] ... documents sufficiently referred to in the complaint.' "). The *Certification of Property No. 40,376* (dkt. #35-1), *Deed of First Auction and Adjudication* (dkt. #26-2), and *Order for Confirmation of Adjudication or Judicial Sale* (dkt. #26-3) fit into these enumerated categories.

property over which it held a property interest in since 2017, citing no support for this theory. Gardenia maintains that it is not a transferee and, assuming *in arguendo* it were, it would be a good-faith transferee because a mortgage extends to any improvements under Puerto Rico law. See id., pp. 6-7. They argue that the *Complaint* lacks well pleaded allegations to support Gardenia's alleged knowledge of the voidability of the Debtor's transfers to Verde.

Legal Issues

The issues pending before this court, as they relate to Gardenia and Count III, are whether the UCC may avoid and recover the value of (i) the Jade Expenditures and (ii) the Jade Timeshare Expenditures from Gardenia as a "subsequent transferee" under Section 550(a)(2) of the Bankruptcy Code. The forgoing necessarily requires this court to consider the nature of the transfers sought to be avoided.

Applicable Law and Analysis

(A)     Motion to Dismiss Standard under Fed. R. Civ. P. 12(b)(6)

Fed. R. Civ. P. 12(b)(6) is made applicable to adversary proceedings through Fed. R. Bankr. P. 7012. In deciding a motion under Fed. R. Civ. P. 12(b)(6), the court must determine whether a complaint states a plausible claim. "The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to assess the legal feasibility of a complaint, not to weigh the evidence which the plaintiff offers or intends to offer." In re Instituto Medico del Norte, Inc., 2021 WL 4944085, at * 2, 2021 Bankr. LEXIS 2924, at *7 (Bankr. D.P.R. 2021); Lugo Alejandro v. Betancourt (In re Betancourt), 2021 WL 438858, 2021 Bankr. LEXIS 298 (Bankr. D.P.R. 2021); Vélez Arcay v. Banco Santander de P.R. (In re Vélez Arcay), 499 B.R. 225, 230 (Bankr. D.P.R. 2013), citing Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2nd Cir. 1984); Citibank, N.A. v. K-H Corp., 745 F. Supp. 899, 902 (S.D.N.Y. 1990).

Fed. R. Civ. P. 8(a)(2), applicable to adversary proceedings through Fed. R. Bankr. P. 7008, mandates complaints contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Although detailed factual allegations are not required, the Rule does call for sufficient factual matter". Surita-Acosta v. Reparto Saman Inc.

(In re Surita Acosta), 464 B.R. 86, 90 (Bankr. D.P.R. 2012). Therefore, to survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter that, accepted as true, "state[s] a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id., at 556. The Twombly standard was further developed in Ashcroft v. Iqbal, 556 U.S. 622 (2009), advising lower courts that "determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Ashcroft, 556 U.S. at 679. "In keeping with these principles, a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. In sum, allegations in a complaint cannot be speculative and must cross "the line between the conclusory and the factual". Peñalbert-Rosa v. Fortuño-Burset, 631 F.3d 592, 595 (1st Cir. 2011). "[A]n adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim." Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 11 (1st Cir. 2011).

In Schatz v. Republican State Leadership Committee, 669 F.3d 50, 55 (1st Cir. 2012), the U.S. Court of Appeals for the First Circuit ("First Circuit") established a two-step standard for motions to dismiss under Fed. R. Civ. P. 12(b)(6). Step one: isolate legal conclusions. Step two: take the complaint's well-pleaded (non-conclusory) allegations as true, drawing all reasonable inferences in favor of the plaintiff and determine if they plausibly narrate a claim for relief. See Pérez v. Rivera (In re Pérez), 2013 WL 1405747 at *3, 2013 Bankr. LEXIS 1561 (Bankr. D.P.R. 2013); Zavatsky v. O'Brien, 902 F. Supp. 2d 135, 140 (D. Mass. 2012).

"Simply because the court is hesitant to dismiss a claim in the early sta[g]es of litigation, however, does not mean that there are not circumstances where the court can and should act. Fed.

R. Civ. P. 12(b)(6) weeds out those allegations that, even with further factual development, will never grow into sustainable claims under the law." Arruda v. Sears, Roebuck & Co., 273 B.R. 332, 340 (D.R.I. 2002). As the First Circuit has stated, "in the menagerie of the Civil Rules, the tiger patrolling the courthouse gates is rather tame, but 'not entirely ... toothless.' " Correa v. Arrillaga, 903 F.2d 49, 52 (1st Cir. 1990), quoting Dartmouth Review v. Dartmouth College, 889 F.2d 13, 16 (1st Cir. 1989).

Consideration of a motion to dismiss requires the court to assume the truth of all well-plead facts and give the benefit of all reasonable inferences therefrom. A complaint that states a claim plausible on its face survives a motion to dismiss. See Banco Santander P.R. v. P.R. Hosp. Supply, Inc. (In re P.R. Hosp. Supply, Inc.), 617 B.R. 181, 191 (Bankr. D.P.R. 2020).

(B)     Pleading Standard under Fed. R. Civ. P. 9(b)

Claims alleging fraud are subject to the heightened pleading standard of Fed. R. Civ. P. 9(b), made applicable to adversary proceedings through Fed. R. Bankr. P. 7009. Under Fed. R. Civ. P. 9(b), the pleader "must state with particularity the circumstances constituting fraud or mistake", but may plead "[m]alice, intent, knowledge, and other conditions of a person's mind" generally. Fed. R. Civ. P. 9(b). "[T]he pleader ordinarily must 'specify the who, what, where, and when' regarding the alleged fraud. Other facets of fraud, such as intent, may be pleaded in general terms." Foisie v. Worcester Polytechnic Inst., 967 F.3d 27, 49 (1st Cir. 2020), quoting Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004), and Rodi v. Southern New England School of Law, 389 F.3d 5, 14 (1st Cir. 2004). "[A] complaint must allege with some specificity the acts constituting fraud ... conclusory allegations that defendant's conduct was fraudulent or deceptive are not enough." In re Actrade Fin. Techs. Ltd., 337 B.R. 791, 801 (Bankr. S.D.N.Y. 2005), quoting Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings, Ltd., 85 F.Supp.2d 282, 293 (S.D.N.Y. 2000). The purpose of the heightened pleading standard is "to place the defendants on notice and enable them to prepare meaningful responses, to preclude the use of a groundless fraud claim as pretext for discovering a wrong, and to safeguard defendants

from frivolous charges that might damage their reputation." Dumont v. Reily Foods Co., 934 F.3d 35, 39 (1st Cir. 2019) (internal quotations omitted).

Whether the rule's particularity requirements apply to constructive fraudulent transfer claims where what is plead is that the transferee "paid no consideration" to transferor (dkt. #1, ¶¶ 31, 36), that the transferor "received less than reasonably equivalent value" (dkt. #1, ¶ 66) or "no value" (dkt. #1, ¶ 73) in exchange for such transfers is a complex question the First Circuit has declined to decide. Instead, the First Circuit has opined as follows:

> We think it evident that even if we assume (without deciding) that [Fed. R. Civ. P.] 9(b) applies across the board to claims of actual and constructive fraudulent conveyance, it would require only that a plaintiff specify in sufficient detail the who, what, where, and when of the challenged transfers. See Alt. Sys. Concepts, 374 F.3d at 29. [Fed. R. Civ. P.] 9(b)'s particularity requirements have no bearing with respect to the other pertinent elements of fraudulent conveyance claims, such as whether the debtor made the transfers with actual fraudulent intent; whether the debtor made the transfers without receiving reasonably equivalent value; or whether the debtor was insolvent at the time of the transfers or rendered insolvent by them. Those elements do not fall within the 'who, what, where, and when' taxonomy … need only comply with the plausibility standard that customarily controls the adequacy of pleadings. See Iqbal, 556 U.S. at 678 []; Twombly, 550 U.S. at 567-568.

Foisie, 967 F.3d at 50.

Further, Fed. R. Civ. P. 9(b) does not demand a dollar-for-dollar accounting so long as the pleader has adequately pleaded the who, what, where, and when of the alleged fraudulent conduct, the rule does not obligate they allege every detail incident to the fraud. See Foisie, 967 F.3d at 50-51 ("Rule 9(b) does not demand a blow-by-blow account"), citing Dumont, 934 F.3d at 38-39. This principle applies with special force when —as in this case— the pleader is an outsider and many, if not all, of the facts missing from the complaint are in the exclusive possession of other parties and potential subjects of discovery. See id.; Corley v. Rosewood Care Ctr., Inc. of Peoria, 142 F.3d 1041, 1051 (7th Cir. 1998) (noting that particularity requirement of Fed. R. Civ. P. 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail a claim, particularly where plaintiff alleges a fraud against one or more third parties); Alt. Sys. Concepts, 374 F.3d at 29 n.4 (noting "extraordinary circumstances" might warrant relaxation of particularity

-14-

requirement and citing Corley). See also In re Comprehensive Power, Inc., 578 B.R. 14, 24 (Bankr. D. Mass. 2017) (noting that Fed. R. Civ. P. 9(b) standard is relaxed when fraud claims are brought by a trustee who must plead from second-hand knowledge); Gowan v. Patriot Grp., LLC (In re Dreier LLP), 452 B.R. 391, 408 (Bankr. S.D.N.Y. 2011) (holding that "[f]or claims brought by a bankruptcy trustee, courts take a more liberal view when examining allegations of actual fraud ... in the context of a fraudulent conveyance, since a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge") (internal quotations and citations omitted).

(C)    The Standards Governing Avoidance under 11 U.S.C. §§ 544 and 548

The Bankruptcy Code provides the trustee with certain "avoidance powers" which enable the trustee "to recover property for the estate [and] avoid certain transfers…" Colón Vidal v. Scotiabank de P.R. (In re Colón Vidal), 578 B.R. 481, 489 (Bankr. D.P.R. 2017) (citation omitted). Here, the UCC argues that (i) the Jade Expenditures and (ii) the Jade Timeshare Expenditures constitute fraudulent transfers that may be avoided under 11 U.S.C. §§ 544 and 548 (dkt. #1, ¶¶ 63-68, 70-73) and seeks to recover their value from Gardenia as a "subsequent transferee" under 11 U.S.C. § 550(a)(2).

Section 548 of the Bankruptcy Code permits the avoidance of transfers based on actual fraud or constructive fraud. See 11 U.S.C. § 548(a)(1)(A) (requiring "actual intent to hinder, delay, or defraud …"); 11 U.S.C. § 548(a)(1)(B)(i)-(ii) (focusing on the economic status of the debtor and the objective reasonableness of transaction to imply constructive fraud). Section 548 has a two-year lookback period that, in the instant case, extends from June 10, 2020, through and including June 10, 2022, the Petition Date. Meanwhile, Section 544(b) of the Bankruptcy Code permits the avoidance of transfers that are voidable under applicable law by an unsecured creditor. In this case, "applicable law" under Section 544(b) includes the provisions of the old Puerto Rico Civil Code, such as Article 1246 alleged in the *Complaint*, 31 L.P.R.A. § 3495 (1930), and Article 1251 which provides that an "action asking [for] rescission must be brought within four (4) years". 31 L.P.R.A. § 3500 (1930) (Official Translation).

The first hurdle to avoid a fraudulent transfer under either Section 544 or 548 is to establish that a "transfer" occurred. See Segarra v. Banco Popular de P.R. (In re Rivera Mercado), 599 B.R. 406, 418 (B.A.P. 1st Cir. 2019), citing Oliveras v. Banco Popular de P.R. (In re Alicea Casanova), 595 B.R. 616, 618 (Bankr. D.P.R. 2018) (recognizing the court must first determine whether there was a "transfer" under Section 101(54) when considering an avoidance action under Section 544).

(D)      What Constitutes a "Transfer" of Property

What constitutes a transfer and when such transfer is complete is a question of federal bankruptcy law. See Barnhill v. Johnson, 503 U.S. 393 (1992).

A "transfer" is defined under Section 101(54) of the Bankruptcy Code as:

(A) the creation of a lien;

(B) the retention of title as a security interest;

(C) the foreclosure of a debtor's equity of redemption; or

(D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—

(i) property; or

(ii) an interest in property.

11 U.S.C. § 101(54).

Congress intended for the Bankruptcy Code's definition of "transfer" to be as broad as possible. See Matter of Besing, 981 F.2d 1488, 1492 (5th Cir. 1993) (citation omitted). Because the Bankruptcy Code's definition of "transfer" expressly references "lien" creation, "foreclosure", "property", and "interest in property", courts must consider the applicable state law because property interests, such as mortgages, are created and defined by state law. See In re Rivera Mercado, 599 B.R. at 418, citing Stern v. Marshall, 564 U.S. 462, 495 (2011); Butner v. United States, 440 U.S. 48 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law"). Thus, the threshold question is whether the Jade

Expenditures and/or the Jade Timeshare Expenditures constitute a "transfer" under Section 101(54) and applicable state law.

The allegations in the *Complaint* are sufficient to establish that a disposing of or parting with property or an interest in property of the Debtor occurred, that is, a "transfer" with respect to both the Jade Expenditures and Jade Timeshare Expenditures under 11 U.S.C. § 101(54)(D). With respect to the Jade Hotel Foreclosure, the court notes that the UCC *does not* seek to avoid the mortgage lien over the Jade Hotel perfected in 2017, or the subsequent foreclosure of such lien in 2022 (dkt. #39, p. 10). It also notes that the "creation of a lien" or the "foreclosure of a *debtor's* equity of redemption" are explicitly recognized as "transfers" under the Bankruptcy Code. See 11 U.S.C. § 101(54)(A) and (C) (emphasis supplied). See also BFP, 511 U.S. at 535; Matter of Besing, 981 F.2d at 1493 ("transfer" expressly includes involuntary dispositions of property in a judicial foreclosure proceedings). The inclusion of the disjunctive "or" signifies a mutually exclusive alternative whereby each term in the statute is meant to stand alone, rather than overlapping or combining with the others.[6] The court notes that to determine whether a mortgage lien and/or a foreclosure was validly perfected for purposes of 11 U.S.C. § 101(54)(A) and (C), it must look to applicable state law: the Commonwealth's Property Registry Act of 2015, 30 L.P.R.A. §§ 6001 *et seq.* However, the relevant provisions of the Commonwealth's Property Registry Act of 2015 cited by Gardenia are only available in the Spanish language and an English translation thereof was not provided. Moreover, the only case cited by Gardenia to support its argument that the foreclosure dates to the perfection of a mortgage lien, and is thus time barred, is In re Perez Cruz, 2021 WL 5858914 (Bankr. D.P.R. 2021), where the U.S. Bankruptcy Court considering the provisions of Article 19 of the Commonwealth's Property Registry Act of 2015, 30 L.P.R.A. § 6034, and noted that the date of recordation is retroactive to the date of presentation. No other case or statute is cited by Gardenia. This court may not consider documents or statutes

---

[6] See In re Hernandez, 487 B.R. 353, 357 (Bankr. D.P.R. 2013) ("The inclusion of the disjunctive "or" signifies that only one of the listed provisions is available."), citing U.S. v. Williams, 326 F.3d 535, 541 (4th Cir. 2003); United States v. Brennick, 908 F. Supp. 1004, 1015 (D. Mass. 1995).

-17-

in the Spanish language under 48 U.S.C. § 864, L. Civ. R. 5(c), and P.R. L.B.R. 9070-1(c), and will not address arguments not properly raised or briefed by the parties.

With this background, we turn to the issue at hand, Gardenia's alleged liability for the transfers sought to be avoided.

(E)    Recovery of Subsequent Transfers under 11 U.S.C. § 550(a)(2)

Section 550 of the Bankruptcy Code governs the liability of transferees of avoided transfers and states, in pertinent part, as follows:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under [11 U.S.C. §§ 544, 545, 547, 548, 549, 553(b), or 724(a)], the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

(c) …

(d) The trustee is entitled to only a single satisfaction under subsection (a) of this section.

11 U.S.C. § 550. That is, a trustee may recover the property transferred or the value of the property transferred from an initial transferee (that is, the entity for whose benefit a transfer was made), or from any immediate or mediate transferee of such initial transferee under Section 550(a)(1)-(2). See Richardson v. United States (In re Anton Noll, Inc.), 277 B.R. 875, 878 (B.A.P. 1st Cir. 2002). Recovery, however, "is limited to a single satisfaction." Id., citing 11 U.S.C. § 550(d) ("The trustee is entitled to only a single satisfaction under [11 U.S.C. § 550(a)].").

The extent of recovery from an initial transferee and that from an immediate or mediate transferee differs significantly. Under Section 550(a)(1), "a trustee's right to recover from an 'initial transferee' is absolute." In re Antex, Inc., 397 B.R. 168, 172 (B.A.P. 1st Cir. 2008), citing Perrino v. Salem, Inc., 243 B.R. 550, 553 (D. Me. 1999) (citations omitted). See also In re Anton Noll, Inc., 277 B.R. at 878 ("Initial transferees are strictly liable to the trustee for recovery of fraudulently transferred property. A trustee "may always recover from the initial transferee regardless of [that transferee's] good faith, value, or lack of knowledge of the voidability of the transfer.") (citations omitted). In contrast, a trustee may not recover under Section 550(a)(2) from a subsequent transferee who accepted the transfer for value, in good faith, and without knowledge of the transfer's voidability. See In re Antex, Inc., 397 B.R. at 172, citing 11 U.S.C. § 550(b). In other words, subsequent transferees may raise the so-called "good faith defense". The trustee must prove that the subsequent transferee had knowledge of the avoidable transfer and acted in bad faith. See 11 U.S.C. § 550(b).

Courts often collapse the requirements of "good faith" and "without knowledge" into one another because both inquiries depend on what the transferee knew at the time of the transfer. See In re Riendeau, 645 B.R. 321, 326 (Bankr. D. Me. 2022) (collecting cases) (citations omitted). "A transferee may lack good faith if he or she possesses sufficient knowledge to cause a reasonable person to investigate." Id., citing In re Callas, 557 B.R. 647, 655 (Bankr. N.D. Ill. 2016), and Bonded Fin. Servs. v. European Am. Bank, 838 F.2d 890, 897-98 (7th Cir. 1988). However, "the structure of 11 U.S.C. § 550 places the burden of monitoring the transaction *on the initial transferee*, which burden is greater than the inquiry notice required of subsequent transferees." Id., citing In re Callas, 557 B.R. at 657; Bonded, 838 F.2d at 892-93. A transferee does not have a duty to investigate the transaction. See In re Bower, 462 B.R. 347, 355 (Bankr. D. Mass. 2012). The purpose of the "good faith" and "without knowledge" requirements is to prevent an initial transferee from "washing" a fraudulent transfer through a third party. Bonded, 838 F.2d at n. 3 and 897-898 ("A transferee that lacks the information necessary to support an inference of knowledge need not start investigating on his own.").

-19-

Gardenia contends that it is neither an initial nor subsequent transferee due to "never acquiring dominion" over the funds allegedly expended on the Jade Hotel, citing Bonded. See dkt. # 25, p. 16; dkt. #45, p. 4. Gardenia also contends that the *Complaint* does not plead that Gardenia received such funds or had any say in how they were used, or that Gardenia was the entity for whose benefit the initial transfers were made, and instead pleads that it is Verde (not Gardenia) who received the transferred funds. See dkt. #25, p. 16. Gardenia further argues that it "never received the funds that [the UCC] alleges the Debtor fraudulently transferred to Verde. The real property Gardenia did receive from Verde—the Jade [Hotel]—was foreclosed … pursuant to a valid state foreclosure proceeding", and "even if Gardenia could be considered a subsequent transferee of the transferred funds, which Gardenia denies, the recovery sought via Count III would still fail because Gardenia validly foreclosed the property pursuant to state law for value". dkt. #25, p. 17, n. 12. To the extent Gardenia argues that value was exchanged in the Jade Foreclosure, that is not the transfer sought to be avoided and any purported value exchanged is not relevant to the allegations that Gardenia is a subsequent transferee of the (i) the Jade Expenditures and (ii) the Jade Timeshare Expenditures.

While the Bankruptcy Code does not define the term "transferee", it is widely accepted that a "transferee" is one who at least has "dominion over the money or other asset, the right to put the money to one's own purposes." In re Antex, Inc., 397 B.R. at 172, quoting In re Anton Noll, Inc., 277 B.R. at 879 (noting that although the First Circuit has yet to address the issue of transferee status under Section 550, courts "have uniformly followed" the test set by the Seventh Circuit in Bonded, *supra*.[7] In In re Anton Noll, Inc., the First Circuit noted that "it has become

---

[7] The Bonded test

is grounded in a practical view of the transaction. Indeed, courts have uniformly rejected the notion that corporate principals should *ipso facto* be held to be the initial transferee when they misappropriate corporate funds. See[,] e.g., Gen. Elec. Capital Auto Lease, Inc. v. Broach (In re Lucas Dallas, Inc.), 185 B.R. 801, 809 (9th BAP Cir.1995) ("A corporate principal does not become a 'transferee' by the mere act of causing the debtor [to] make a fraudulent transfer.") (Citing to Richardson v. FDIC (In re M. Blackburn Mitchell, Inc.), 164 B.R. 117 (Bank.N.D.Cal.1994)); In re Southeast Hotel, 99 F.3d at 156 (same). Rather, the "dominion and control" test "requires courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and

well settled that [initial] transferee status under § 550(a)(1) necessitates the transferee's 'dominion and control', and that 'dominion and control' refers to legal, as opposed to mere physical possession of the property transferred." 277 B.R. at 879 (citation omitted). "[T]o be held to the standard of the initial transferee, a transferee must have the legal right to use the funds to whatever purpose he or she wishes, be it to invest in 'lottery tickets or uranium stocks.' " Id., citing Bonded, 838 F.2d at 894.

In In re Velazquez, this court analyzed the governing principles of property ownership under Puerto Rico law, specifically Article 280 of the old Puerto Rico Civil Code, which defines "ownership" as "the right by which a thing belongs to some one[sic] in particular; to the exclusion of all other persons." 397 B.R. 231, 236 (Bankr. D.P.R. 2008), *aff'd sub nom.*, 625 F.3d 34 (1st Cir. 2010), citing 31 L.P.R.A. § 1111 (1930). "According to well-known civil law principles, the ownership of a thing always rests with the person who has immediate dominion of the same, regardless of whether another person uses or enjoys the said thing in any manner." Id., at 237, quoting Nieves Velez v. Bansander Leasing Corp., *et al*, 136 D.P.R. 827 (1994) (Official Translation), citing Article 283 of the old Puerto Rico Civil Code, 31 L.P.R.A. § 1114 (1930). The court also noted that:

> "[d]ominion includes the right of the owner to benefit from the thing that belongs to him by obtaining the fruits or yield of the same. It also includes the right of the owner to carry out legal acts to dispose of the thing, alienating it or subjecting it to liens or restrictions." Nieves Velez, *supra* at 5, citing [Article 280 of the old Puerto

equitable." Danning v. Miller (In re Bullion Reserve of N. Am.), 922 F.2d 544, 549 (9th Cir.1991). *Accord* In re Lucas Dallas, Inc., 185 B.R. at 808.

Applying this practical approach, the Bonded court distinguished between two scenarios wherein a corporate principal misappropriates funds from a debtor company for the principal's personal use. In the first, characterized as a "one step transaction," the principal causes the company to issue a check payable directly to the principal's creditor. As an example, "[i]f the note accompanying [the] check [states]: 'use this check to reduce [the principal's] loan instead of 'deposit this check into [the principal's] account,' § 550(a)(1) would provide a ready answer. The [b]ank would be the initial transferee and [the principal] would be the entity for whose benefit the transfer was made." Bonded, 838 F.2d at 892. In the second scenario, a "two step transaction," the principal first acquires legal title to the funds and therefore full dominion and control, and accordingly must be deemed to be the initial transferee. Id.[,] at 893–94.

In re Anton Noll, Inc., 277 B.R. at 880.

-21-

Rico Civil Code, 31 L.P.R.A. § 1111 (1930)] (other citations omitted), Cf. Wapa TV Broadcasting Co. v. Secretary of Treasury, 5 PR Offic Trans 1134, 105 P.R.R. 816 (1977) (the modern civil law concept of ownership is no longer rigidly wrapped around the power of alienation codified in [Article 280 of the old Puerto Rico Civil Code], but instead includes the broadest possible control or power over a tangible thing; control which is autonomous in character, perpetual in principle, elastic in nature and of a partially discriminable content).

397 B.R. at 238-239. In noting the foregoing, the court has not conceded whether the old or new Puerto Rico Civil Code govern the transfers object of the *Complaint*.

(F)     Discussion

The *Complaint* filed by the UCC must specify in sufficient detail the "who, what, where, and when" of the challenged transfers to survive Gardenia's *Motion to Dismiss* for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Foisie, 967 F.3d at 49.

The allegations in the *Complaint* are sufficient to establish that a disposing of or parting with property or an interest in property of the Debtor occurred, that is, a "transfer" with respect to both the Jade Expenditures and Jade Timeshare Expenditures under 11 U.S.C. § 101(54)(D). The *Complaint* alleges that Debtor and/or ATWH (Debtor's direct or indirect owner)[8] transferred funds from the Debtor to Verde, and Verde used said funds to finance the construction of the Jade Hotel (which Verde owned, subject to VHP's mortgage lien (now Gardenia's)). See dkt. #1, pp. 2-8. After the alleged transfers occurred, Verde defaulted on its loan obligations and VHP (now Gardenia) foreclosed on the Jade Hotel subject to its mortgage lien. Id. The *Complaint* alleges that Verde had dominion or control over the funds transferred, using the funds for its own purposes: the construction of the Jade Hotel. The *Complaint* also alleges that Gardenia (previously VHP) had knowledge of the voidable transfers when it commenced on the Jade Foreclosure, and thus, is not a good faith transferee.

---

[8] The court takes judicial notice pursuant to Fed. R. Evid. 201 of Debtor's organizational and capital structure. See *Debtor's Organizational and Capital  Structure*, Adv. Pro. No. 22-00055, dkt. #12-1, pp. 127, 519 , and 988. In so doing, it notes that various federal statutes refer to "direct or indirect ownership". See *e.g.*, 11 U.S.C. § 101(2) (referring to an entity that "directly or indirectly owns [or] controls" as an "affiliate"); 31 U.S.C. § 5336(a)(3)(A) (referring to "an individual who, directly or indirectly … (i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity" as a "beneficial owner"). The court further notes that the term "beneficial owners" has been used synonymously with "true" owner. See Boyle v. Bessent, 2025 WL 509519, at *1 (D. Me. 2025). In so doing, this court is not making a determination as to whether ATWH or Mr. St. Clair is a direct, indirect, or beneficial owner of the Debtor.

-22-

More specifically, with respect to the First Jade Expenditure and Second Jade Expenditure, the UCC alleges that a "substantial portion" of a $4.8 million insurance advance and a $1.5 million Attenure advance were "expended" on the Jade Hotel "[d]uring the period [of] June 10, 2020, through the Petition Date". Id., ¶¶13-17, 63. With respect to the Third Jade Expenditure, the UCC alleges that a substantial portion of a $5 million Parliament Loan were "expended" on the Jade Hotel and/or on "investments and ventures other than the Debtor and its business" "[d]uring the period [of] June 10, 2020, through the Petition Date" by ATWH (direct or indirect owner of Debtor). Id., ¶¶ 21, 23, 63. With respect to the Fourth Jade Expenditure, the UCC alleges that "millions" of a $5.7 million 2020 Oriental Loan were "expended" on the Jade Hotel "[d]uring the period [of] June 10, 2020, through the Petition Date". Id., ¶¶ 29-30, 63. With respect to the Jade Timeshare Expenditures, the UCC alleges that from "2018 through the end of 2021", the Debtor "invested" a "substantial portion" of "tens of thousands of dollars" or "more than $8 million" —paid by six hundred (600) vacation interval owners and vacation club members "for the right to pay a nominal administrative fee for a timeshare interest in [the Jade Hotel]" — "on the construction of the Jade [Hotel]". Id., ¶¶ 32-35. The UCC also alleges that the Jade Timeshare Expenditures were made "[d]uring the period [of] June 10, 2020, through the Petition Date". Id., ¶¶ 63-64.

The court notes that the UCC does not specify, for example, the exact dollar amount of the transfers, the exact date on which the transfers occurred, the individuals or entities who may have negotiated or facilitated the various transfers on behalf of the Debtor, the accounts from which the funds were transferred, or the means used to effectuate such transfers. But, Fed. R. Civ. P. 9(b) does not demand a dollar-for-dollar accounting. The UCC is an outsider to the alleged transfers and many, if not all, of the facts missing are in the exclusive possession of other parties, namely the Debtor, Verde, and Gardenia. The foregoing warrants relaxation of Fed. R. Civ. P. 9(b)'s pleading requirements. See e.g., Foisie, 967 F.3d at 50-51; Dumont, 934 F.3d at 38-39; Corley, 142 F.3d at 1051; In re Comprehensive Power, 578 B.R. at 24; In re Dreier, 452 B.R. at 408. The court finds that the allegations indicate the "who," that Debtor was the transferor, Verde

-23-

the initial transferee, and VHP (now Gardenia) the subsequent transferee; the "what," the Jade Expenditures and Jade Timeshare Expenditures; the "where," that such funds were expended on or transferred to the Jade Hotel; and, the "when," during the applicable avoidance period alleged. Consequently, the UCC has met its burden under Fed. R. Civ. P. 9(b) and adequately plead the who, what, where, and when of the alleged fraudulent conduct.

The allegations also adequately plead a fraudulent conveyance claim under 11 U.S.C. §§ 544 and 548 against Verde. The court finds that the allegations also adequately plead that Verde acted as an initial transferee or as an entity for whose benefit a transfer was made for purposes of 11 U.S.C. § 550(a)(1), and that Gardenia (previously VHP) acted as an immediate or mediate transferee of Verde in foreclosing on the Jade Hotel after the funds were expended for its construction for purposes of 11 U.S.C. § 550(a)(2). In so finding, the court is not deciding whether the alleged transfers are fraudulent avoidable transfers. As the party seeking to set aside the transfers, the UCC carries the burden of proving each element of a fraudulent transfer claim by a preponderance of the evidence. See Tri–Star Techs. Co. v. Pitocchelli (In re Tri–Star Techs. Co., Inc.), 260 B.R. 319, 323 (Bankr. D. Mass. 2001).

Conclusion

In view of the foregoing, taking the well-pleaded, non-conclusory allegations as true and drawing all reasonable inferences in favor of the UCC to determine if they plausibly state a claim for relief under 11 U.S.C. § 550(a)(2) against Gardenia Hotel Partners LLC, the court finds that dismissal of the *Complaint* is not appropriate at this stage. For the reasons stated herein, Gardenia's *Motion to Dismiss* (dkt. #25) is DENIED.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 1st day of April 2025.

Enrique S. Lamoutte
United States Bankruptcy Judge

-24-